# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-3903
_____

D. Bart Rockett, as next friend of his minor children, K.R. and B.R.

*Plaintiff - Appellee*

v.

The Honorable Eric Eighmy

*Defendant - Appellant*

------------------------------

National Police Accountability Project; Institute for Justice; National Association of Counsel for Children

*Amici on Behalf of Appellee(s)*
_____

Appeal from United States District Court
for the Western District of Missouri - Springfield
_____

Submitted: February 16, 2023
Filed: June 22, 2023
_____

Before SMITH, Chief Judge, STRAS and KOBES, Circuit Judges.
_____

STRAS, Circuit Judge.

Bart Rockett sued a Missouri judge for putting his kids in jail twice, once after a custody hearing and again after ordering law enforcement to pick them up in Louisiana. At this early stage, the only question before us is whether judicial immunity shields these acts. The district court said no. We affirm in part and reverse in part.

I.

Rockett and Kami Ballard divorced each other in Missouri and initially shared custody of their two children. Despite their differences, the whole family packed their bags and moved to California, where they were hoping that the children, who were aspiring stars, would make it big.

The parents' relationship remained rocky, even after the move. Ballard, in particular, did not like sharing custody. Nor did she like how slowly the California courts were dealing with her request for sole custody. So she filed a second one in Missouri, where it landed on the desk of Judge Eric Eighmy.

Judge Eighmy wanted to see the family in person before he ruled. When they arrived at the courthouse, the children waited in the lobby while Ballard and Rockett, along with their attorneys, worked out an agreement. It called for the children to stay with Ballard for about a month before returning to live with Rockett.

The children did not want to live with Ballard, even for a short time, so they let her hear about it in the lobby. Judge Eighmy, by this time unrobed, saw what was happening and tried to intervene. But when the children refused to back down, he took them to a conference room. Once there, he told them they needed to leave Hollywood, or else they would not grow up "normal." When the children continued to protest, Judge Eighmy decided to put them in jail to show "what [he] can do."

He took them there himself. They were ordered to remove their shoes, socks, jackets, and jewelry before entering separate cells. After approximately an hour,

-2-

Case 6:21-cv-03152-MDH   Document 47   Filed 06/23/23   Page 2 of 11
Appellate Case: 21-3903   Page: 2   Date Filed: 06/22/2023 Entry ID: 5288520

Judge Eighmy returned and asked if they were "ready to listen" and "comply."  They finally agreed to go with Ballard, but only after he threatened to place them in foster care.  This would not be the last time they saw the inside of a jail cell.

Several months later, Ballard filed a contempt motion that prompted Judge Eighmy to schedule another hearing.  This time, neither Rockett nor the children, who were by then living in Louisiana, showed up.  Their absence did not sit well with Judge Eighmy, who issued a writ of bodily attachment for Rockett and a pick-up order for the children.  In executing it, Louisiana officers came to their door, gave the children *Miranda* warnings, and placed them both in solitary confinement in a juvenile-detention center.

These orders set off a flurry of activity.  First, the Missouri Supreme Court issued a writ of prohibition that required Judge Eighmy to vacate his orders.  Second, Rockett brought the Missouri Supreme Court order to a Louisiana judge, who released the children.

Unhappy with the treatment they received, Rockett filed a civil-rights action against Judge Eighmy in federal district court.  *See* 42 U.S.C. § 1983.  The complaint alleged that placing his children in jail, and then later in a juvenile-detention facility, violated their First, Fourth, and Fourteenth Amendment rights.  Judge Eighmy argued that he should receive absolute immunity, but the district court disagreed and ruled that the case could proceed.

Fortunately for Judge Eighmy, a denial of absolute immunity is immediately appealable.  *See Alt. Fuels, Inc. v. Cabanas*, 435 F.3d 855, 858 (8th Cir. 2006).  At this stage, our review is de novo, *see Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013), and "limited to the facts alleged in the . . . [c]omplaint, which we accept as true and view most favorably to the plaintiffs," *J.T.H. v. Mo. Dep't of Soc. Servs. Child.'s Div.*, 39 F.4th 489, 491 (8th Cir. 2022) (citation omitted).

-3-

Case 6:21-cv-03152-MDH   Document 47   Filed 06/23/23   Page 3 of 11
Appellate Case: 21-3903   Page: 3   Date Filed: 06/22/2023 Entry ID: 5288520

II.

Judicial immunity has been around a long time. *See Yates v. Lansing*, 5 Johns. 282, 291 (N.Y. Sup. Ct. 1810) ("The doctrine which holds a judge exempt from a civil suit or indictment, for any act done, or omitted to be done by him, sitting as judge, has a deep root in the common law."), *aff'd*, 9 Johns. 395 (N.Y. 1811). In England, it served to insulate common-law judges on the King's courts from their rivals on other courts. *See* 5 W. S. Holdsworth, *A History of English Law* 159–60 (1924) (explaining how judicial immunity "strengthened the position of the common[-]law courts").[1]

One of the earliest known examples involved a judge who presided over a murder trial. After it ended, he was dragged into a rival court and charged with conspiracy for his role. *See Floyd v. Barker*, 77 Eng. Rep. 1305, 1307 (Star Chamber 1607); *see also Pulliam v. Allen*, 466 U.S. 522, 530 (1984) (describing the case). The prosecution ended, however, when the court recognized that the judge was "immune from prosecution . . . for [his] judicial act[]." *Pulliam*, 466 U.S. at 530.

---

[1] By the thirteenth century, the King's courts were the sole venue for claims of judicial error. *See* Statute of Marlborough 1267, 52 Hen. 3, c. 19 (explaining that the "[p]lea of false [j]udgement" belonged to "the Crown" alone); *see also* 1 Frederick Pollock & Frederic William Maitland, *The History of English Law Before the Time of Edward I*, at 590–91 (2d ed. 1909) ("If the court of the lower lord made default in justice, the case could be removed at once into the county court and thence to the king's court, and none but the king's court could hear a charge of false judgment."). Before then, if a litigant accused a judge of rendering a "false [j]udgment," a duel would decide the dispute. Ranulph de Glanville, *A Treatise on the Laws and Customs of the Kingdom of England* 171–72 (John Beames trans., John Byrne & Co. 1900) (describing the law at the time of Henry II). If a judge, or his champion, lost and was "convicted of the charge," then he would be "amerced to the King" and "ever . . . deprived of his Court." *Id.* at 172. Allowing judges in the King's courts to hear these types of disputes was the genesis of appellate review—a less dangerous way of dealing with unfavorable judgments. *See* Pollock & Maitland, *supra*, at 590–91 (explaining that the "charge of false judgment" helped develop a system of appellate jurisdiction in the King's courts, which greatly reduced the power of "feudal courts" and "courts of baronies and honours").

-4-

Case 6:21-cv-03152-MDH   Document 47   Filed 06/23/23   Page 4 of 11
Appellate Case: 21-3903   Page: 4   Date Filed: 06/22/2023 Entry ID: 5288520

As Lord Edward Coke put it, a judge could not be liable for what "a Judge doth as Judge." *Floyd*, 77 Eng. Rep. at 1307.

As broad as the rule seemed to be, two exceptions narrowed its scope. The first was that judges could still be prosecuted for *out-of-court* "conspirac[ies]." *Id.* at 1306. That is, like any other citizen, judges could be haled into court for any illegal acts they committed outside the courtroom. *See id.* The second was that, when judges "exceeded their authority" by considering a matter "not within their jurisdiction," their actions were "coram non judice," *Terry v. Huntington*, 145 Eng. Rep. 557, 559 (Ex. 1679), the Latin phrase for "before one not a judge" and shorthand for "without jurisdiction," *Webster's Third New International Dictionary* 505 (2002). Acting without "power and authority" eliminated the shield of judicial immunity. 6 Holdsworth, *supra*, at 236 (citation omitted).

As judicial rivalries began to wane, including in the American colonies, the power-and-authority rationale for judicial immunity did too. The focus shifted to protecting judicial independence: allowing judges "to act upon [their] own convictions, without apprehension of personal consequences." *Bradley v. Fisher*, 80 U.S. 335, 347 (1871); *see Forrester v. White*, 484 U.S. 219, 225 (1988); *Pierson v. Ray*, 386 U.S. 547, 554 (1967) (explaining that judges "should not have to fear that unsatisfied litigants may hound [them] with litigation charging malice or corruption").

Judicial immunity continues to apply today, not only in prosecutions like *Floyd*, but in civil-rights actions brought under 42 U.S.C. § 1983. *See Pierson*, 386 U.S. at 553–54 (noting that congressional silence in the Reconstruction Era statutes was not enough to do away with such a "solidly established" doctrine from the "common law"). It remains an "absolute" barrier to suit, *see J.T.H.*, 39 F.4th at 491, even for judicial acts done "in error, . . . maliciously, or . . . in excess of . . . authority," *Stump v. Sparkman*, 435 U.S. 349, 356 (1978).

-5-

Case 6:21-cv-03152-MDH   Document 47   Filed 06/23/23   Page 5 of 11
Appellate Case: 21-3903   Page: 5   Date Filed: 06/22/2023 Entry ID: 5288520

The exceptions remain largely the same too. Judicial immunity can be "overcome in only two sets of circumstances": (1) when a judge takes "nonjudicial actions"; and (2) when the action is judicial, but is done "in the complete absence of all jurisdiction." *Mireles v. Waco*, 502 U.S. 9, 11–12 (1991) (per curiam); *see Bradley*, 80 U.S. at 347 (explaining that if the "character" of a judge's act is "judicial" and within "the jurisdiction of the court," then the judge "cannot be subjected to responsibility for it in a civil action"). These exceptions play a critical role in deciding today's case.

A.

The dividing line between judicial and nonjudicial acts can be fuzzy. *See Forrester*, 484 U.S. at 227 ("Difficulties have arisen primarily in attempting to draw the line between truly judicial acts, for which immunity is appropriate, and acts that simply happen to have been done by judges."). Judges do more than just decide cases. Some routine tasks are administrative, such as hiring staff, approving rule changes, attending meetings, and scheduling hearings. Some of these tasks are more case-related than others. *Compare id.* at 229 (explaining that firing court employees is not a judicial task), *and Sup. Ct. of Va. v. Consumers Union of the U.S.*, 446 U.S. 719, 731 (1980) (holding that issuing the Virginia Bar Code "was not an act of adjudication but one of rulemaking"), *with Bliven v. Hunt*, 579 F.3d 204, 211–14 (2d Cir. 2009) (concluding that judges receive absolute immunity for determining public-defender compensation), *and Davis v. Tarrant County*, 565 F.3d 214, 219, 226 (5th Cir. 2009) (explaining that judges are absolutely immune when setting the rules for court-appointed attorneys).

Even within the case-related realm, the judicial-immunity analysis accounts for the fact that not all proceedings look the same. A state-court juvenile proceeding may look very different from a major class-action lawsuit in federal court. *Compare Schall v. Martin*, 467 U.S. 253, 263 (1984) (discussing "the 'informality' and 'flexibility' that characterize juvenile proceedings" (quoting *In re Winship*, 397 U.S. 358, 366 (1970))), *with Rodgers v. Bryant*, 942 F.3d 451, 464 (8th Cir. 2019) (Stras,

-6-

Case 6:21-cv-03152-MDH   Document 47   Filed 06/23/23   Page 6 of 11
Appellate Case: 21-3903   Page: 6   Date Filed: 06/22/2023 Entry ID: 5288520

J., concurring in part and dissenting in part) (describing how Federal Rule of Civil Procedure 23 dictates "comprehensive" rules for class actions that do not allow plaintiffs to "use some other procedure to seek relief"). Judicial acts can take on different forms: what may look non-case related in one context may be standard operating procedure in another. *Compare United States v. Harrison*, 974 F.3d 880, 881 (8th Cir. 2020) ("Judges should not participate in plea negotiations."), *with* Sanford N. Katz, *Family Law in America* 145–47 (3d ed. 2021) (discussing a judge's active role in setting child-custody arrangements). Judicial immunity provides a wide berth for these differences. *Cf. Forrester*, 484 U.S. at 227 (explaining that judicial immunity "is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches").

The array of tasks, courts, and cases has led to the adoption of a functional test: the availability of judicial immunity depends on "the function performed, not the identity of the actor who performed it." *Id.* at 227–29. Perhaps the most important question is whether the "function [is one] normally performed by a judge." *Stump*, 435 U.S. at 362. Another is whether the parties are "deal[ing] with the judge in [a] judicial capacity." *Id.* The overall focus is on distinguishing "between judicial acts and the administrative, legislative, or executive functions that judges may on occasion . . . perform." *Forrester*, 484 U.S. at 227–29. The former are shielded by judicial immunity. The latter are not.

On one end of the spectrum, the classic example of a judicial act is "resolving disputes between parties who have invoked the jurisdiction of a court." *Id.* at 227. Other related acts qualify too, like holding litigants "in contempt," *Liles v. Reagan*, 804 F.2d 493, 495 (8th Cir. 1986); *see Yates*, 5 Johns. at 289–90 (explaining that every court has the "authority to punish contempts" and must "judge what are contempts"), and issuing "search warrant[s]," *Burns v. Reed*, 500 U.S. 478, 492 (1991).

But those acts also have their limits. There is no doubt, for example, that judges can "direct[] police officers to bring counsel in a pending case before the

-7-

Case 6:21-cv-03152-MDH   Document 47   Filed 06/23/23   Page 7 of 11
Appellate Case: 21-3903   Page: 7   Date Filed: 06/22/2023 Entry ID: 5288520

court," but they cannot order the officers to beat them with their nightsticks along the way. *Mireles*, 502 U.S. at 12–13. Nor can judges wake up one day and decide to spontaneously issue a search warrant against a nosy neighbor or a political rival. *See Harper v. Merckle*, 638 F.2d 848, 859 (5th Cir. 1981) (explaining that when "a judge has acted out of personal motivation and has used his judicial office as an offensive weapon to vindicate personal objectives, and it further appears certain that no party has invoked the judicial machinery for any purpose at all, then the judge's actions do not amount to 'judicial acts'"); *Zarcone v. Perry*, 572 F.2d 52, 53, 55 (2d Cir. 1978) (authorizing a punitive-damages award against a judge who ordered a coffee vendor to be brought "in front of [him] in cuffs" for the crime of making "putrid" coffee).

Like these examples, Judge Eighmy's decision to personally escort the kids to jail took what would otherwise be a judicial act too far. Judges have the authority to order an officer or a bailiff to escort an unruly litigant to jail. *See Mireles*, 502 U.S. at 13. They can also pull the parties into a conference room to discuss what just happened in court. *Cf. McAlester v. Brown*, 469 F.2d 1280, 1282 (5th Cir. 1972) (holding that a judge had absolute immunity after punishing a defendant's parents for contempt during a meeting in his office).

Judge Eighmy crossed the line, however, when he personally escorted the kids to jail, stood there while they removed their clothes and belongings, and personally came back an hour later to release them. *See, e.g.*, *Gregory v. Thompson*, 500 F.2d 59, 64–65 (9th Cir. 1974) (concluding that a judge who physically removed an individual from the courtroom could not receive judicial immunity for the assault). For one thing, the children were not even present in the courtroom, so he could not hold them in contempt for "[d]isorderly, contemptuous or insolent behavior." *See* Mo. Rev. Stat. § 476.110(1) (giving judges the ability to punish these types of acts under its contempt power when they occur "during [the court's] session, in its immediate view and presence"). For another, judges do not do double duty as jailers. So even assuming Judge Eighmy could have ordered *someone else* to take the kids to jail, he could not put them there *himself*. *See Forrester*, 484 U.S. at 227.

-8-

Case 6:21-cv-03152-MDH   Document 47   Filed 06/23/23   Page 8 of 11
Appellate Case: 21-3903   Page: 8   Date Filed: 06/22/2023 Entry ID: 5288520

It is no answer that Judge Eighmy believes he was exercising his contempt power. *See Liles*, 804 F.2d at 495 (explaining that issuing a contempt order is a judicial function). To be sure, absolute immunity is available for judges who hold a litigant in contempt even when they are "not in [their] . . . robes, . . . no[r] in the courtroom itself." *Stump*, 435 U.S. at 361 (quoting *McAlester*, 469 F.2d at 1282); *see Malina v. Gonzales*, 994 F.2d 1121, 1124–25 (5th Cir. 1993). But here, the children were never parties, they never stepped foot in the courtroom, and Judge Eighmy personally locked them up himself. We have been unable to find *any* case that extends judicial immunity so far.

Judge Eighmy fares no better with his other argument: that Missouri law allows judges to enforce child-welfare statutes informally. Without question, *police officers* can take children into custody if they are behaving in a way "injurious to [their] welfare or to the welfare of others." Mo. Rev. Stat. § 211.131(1). But not judges, who can only order others to "[t]ake charge of children before and after" a juvenile hearing. *Id.* § 211.401.1(3). The point is that judicial immunity is unavailable because what Judge Eighmy did is *not* "a function normally performed by a judge." *Stump*, 435 U.S. at 362.

B.

Pick-up orders, on the other hand, are hardly unusual. Under Missouri law, a judge can issue one in certain situations to take "physical custody" of a child subject to a "custody determination." Mo. Rev. Stat. § 452.885.1 (authorizing warrants to take "physical custody" of a child subject to a "child[-]custody determination" when he or she "is likely to suffer serious imminent physical harm or removal from" Missouri). That alone makes it a judicial act. The dispute now is whether Judge Eighmy had jurisdiction to issue one *here*. Or did he, as Rockett argues, act in the "complete absence of all jurisdiction"? *Mireles*, 502 U.S. at 11–12.

-9-

Case 6:21-cv-03152-MDH   Document 47   Filed 06/23/23   Page 9 of 11
Appellate Case: 21-3903   Page: 9   Date Filed: 06/22/2023 Entry ID: 5288520

As courts of general jurisdiction, Missouri's circuit courts can hear all kinds of cases, including child-custody disputes. *See* Mo. Const. art. V, § 14; *see also Hightower v. Myers*, 304 S.W.3d 727, 733 (Mo. banc 2010) (explaining that the Missouri Constitution grants circuit courts original jurisdiction over all cases "civil and criminal," including child-custody cases (citation omitted)). So Judge Eighmy's pick-up order, even if "erroneous or irregular," *Bradley*, 80 U.S. at 354, was part of a "civil case" over which he had jurisdiction, *Hightower*, 304 S.W.3d at 733. *See Stump*, 435 U.S. at 356 ("[T]he necessary inquiry in determining whether a defendant judge is immune from suit is whether at the time he took the challenged action he had jurisdiction over the subject matter before him."). So far, so good.

The problem, at least according to Rockett, was that Missouri has adopted the Uniform Child Custody Jurisdiction and Enforcement Act, which provides rules to avoid overlapping review in child-custody disputes. *See* Mo. Rev. Stat. §§ 452.700–930 (codifying the Act as state law). Under one of its provisions, courts may not exercise jurisdiction when "a proceeding concerning the custody of the child ha[s] been previously commenced in a court of another state." *Id.* § 452.765.1. From there, the argument is that, by ignoring the fact that there was already a child-custody proceeding ongoing in California, Judge Eighmy acted "in the complete absence of all jurisdiction." *Just. Network, Inc. v. Craighead County*, 931 F.3d 753, 762 (8th Cir. 2019) (citation omitted).

At first glance, this statute looks like one that limits the subject-matter jurisdiction of Missouri's circuit courts. *See, e.g.*, *Harignordoquy v. Barlow*, 313 P.3d 1265, 1268–69 (Wyo. 2013) (treating the statute as jurisdictional); *Friedman v. Eighth Jud. Dist. Ct. ex rel. County of Clark*, 264 P.3d 1161, 1165–66 (Nev. 2011) (same); *Rosen v. Rosen*, 664 S.E.2d 743, 747–48 (W. Va. 2008) (same). After all, it speaks in jurisdictional terms. *See* Mo. Rev. Stat. § 452.765.1 (providing that "a court of this state shall not exercise its jurisdiction . . .").

A deeper look, however, reveals that Missouri does not treat it that way. *See Just. Network, Inc.*, 931 F.3d at 762 (looking to state law to determine a state court's

-10-

Case 6:21-cv-03152-MDH   Document 47   Filed 06/23/23   Page 10 of 11
Appellate Case: 21-3903   Page: 10   Date Filed: 06/22/2023 Entry ID: 5288520

subject-matter jurisdiction); *Schottel v. Young*, 687 F.3d 370, 373–74 (8th Cir. 2012) (same). As the Missouri Supreme Court has put it, "[s]ubject[-]matter jurisdiction is governed by article V of the Missouri Constitution," not "[t]he circuit court's statutory or common law authority to grant relief in a particular case." *Hightower*, 304 S.W.3d at 733.

It is true, as Rockett argues, that Missouri courts once had a different view. *See Miller v. Sumpter (In re the Marriage of Miller & Sumpter)*, 196 S.W.3d 683, 689 (Mo. Ct. App. 2006); *State ex rel. Dep't of Soc. Servs. v. Hudson*, 158 S.W.3d 319, 323 (Mo. Ct. App. 2005). No longer. *See Hightower*, 304 S.W.3d at 733 (explaining that jurisdiction over child-custody cases "is governed by article V of the Missouri Constitution"). Since at least 2015, the Missouri Supreme Court has been clear that it restricts only "the statutory authority to grant relief . . . , not whether a Missouri court has subject[-]matter jurisdiction." *Blanchette v. Blanchette*, 476 S.W.3d 273, 279 (Mo. banc 2015).

Subject-matter jurisdiction is what counts in these types of cases. And here, even if Judge Eighmy had no "express authority" to issue the pick-up order, he is immune because he had jurisdiction to issue one. *Stump*, 435 U.S. at 358. He cannot be sued, in other words, no matter how erroneous his interpretation of the Uniform Child Custody Jurisdiction and Enforcement Act may be. *See Bradley*, 80 U.S. at 354.

### III.

We accordingly affirm in part, reverse in part, and remand for further proceedings on the first of the two incidents.

_____

-11-

Case 6:21-cv-03152-MDH Document 47 Filed 06/23/23 Page 11 of 11
Appellate Case: 21-3903   Page: 11   Date Filed: 06/22/2023 Entry ID: 5288520