UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| D. BART ROCKETT,<br>*as next friend of his minor child B.R.,*<br><br>and<br><br>KADAN ROCKETT,<br><br>Plaintiffs,<br><br>v.<br><br>THE HONORABLE ERIC D. EIGHMY,<br>*in his individual capacity only,*<br><br>Defendant. | ) | No. 6:21-cv-03152-MDH<br><br>**PLAINTIFFS DEMAND JURY TRIAL** |

**<u>First Amended COMPLAINT</u>**

**<u>Civil Rights, 42 U.S.C. § 1983, for Damages</u>**

Plaintiff D. Bart Rockett, as next friend of his minor child B.R. pursuant to Fed. R. Civ. P. 17(c)(2), and Plaintiff Kadan Rockett, by counsel Hugh A. Eastwood and W. Bevis Schock, state as follows for their Complaint, 42 U.S.C. § 1983, for damages against defendant The Honorable Eric D. Eighmy, in his individual capacity only:

## Introduction

1. B.R., a minor, and her older brother Kadan Rockett are actors and celebrity entertainers. At a court date in Taney County, their parents settled a custody modification. Afterward, in the lobby, B.R. and Kadan stated firmly they did not want to leave with their mother. Judge Eighmy, acting in a police function without judicial process or immunity, personally jailed the children for approximately one hour. He had made no findings of contempt, delinquency, or probable cause. Judge Eighmy later issued pick up orders for the children, and

they were jailed for two nights in Louisiana. Their father, as Next Friend, claims §1983 damages for those acts to which the Eighth Circuit has determined that judicial immunity does not apply.[1]

**Parties**

2. Kadan Rockett is now 18 years of age, and his younger sister B.R. was born in 2007 and is now 16 years of age. They are public figures in the entertainment industry, and aspects of this matter are already well publicized in the press and on the internet.[2]

3. Plaintiff D. Bart Rockett, an individual, is the father of and acts here as the Next Friend of B.R. pursuant to Fed. R. Civ. P. 17(c)(2). Plaintiff has sole custody.

4. Kadan, B.R. and Bart[3] have been residents of Union Parish, Louisiana since Spring 2020. At all other relevant times, they were residents of Los Angeles County, California. At all relevant times, their entertainment business has operated out of California.

5. Defendant The Honorable Eric D. Eighmy is an Associate Circuit Judge in Taney County, Missouri, within Missouri's 46th Judicial Circuit. Plaintiffs sue Judge Eighmy in his individual capacity only.

**Jurisdiction and Venue**

6. Plaintiffs bring this civil rights action pursuant to 42 U.S.C. § 1983 and § 1988; and the First, Fourth and Fourteenth Amendments to the United States Constitution.

7. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343 and 2201.

---

[1] *Rockett v. Eighmy,* No. 21-3903 (8th Cir. June 22, 2023).

[2] B.R. proceeds here by her initials and year of birth pursuant to Fed. R. Civ. P. 5.2(a)(2) and (3).

[3] The pleading uses adult family member's first names not out of undue familiarity, but to avoid confusion. Further, the pleading refers to B.R. and Kadan as "the children" because all relevant torts first occurred while B.R. and Kadan were 12 and 14 years of age, respectively.

8. Venue is proper in this Court under 28 U.S.C. § 1391 because Defendant carried out his relevant acts within Taney County, Missouri, which is within the Southern Division of this Court.

**Color of State Law**

9. At all relevant times, the Defendant acted under color of state law. Particularly, at all relevant times, the Defendant acted under color of the laws, statutes, ordinances, regulations, policies, customs and usages of the State of Missouri.

**Jury Demand**

10. Plaintiffs demand a jury trial on their claims for damages.

**Facts**

**The Taney County Jailings**

11. At all relevant times before 2009, Bart and his former wife Kami Lyn Rockett lived in Branson, Missouri, where Bart operated a theater and was a well-known entertainer.

12. Bart and Kami are the children's parents.

13. Bart and Kami were divorced on August 31, 2009 in Taney County Circuit Court, Missouri, pursuant to a Judgment and Decree of Dissolution of Marriage, case no. 07AF-CV00944, entered by the Honorable James K. Justus.

14. In 2009 Bart, Kami, and the children, after and despite the divorce, moved to Los Angeles County, California, where they lived as a family, and the children pursued professional careers in the entertainment industry.

15. During that time, the children attended public schools in California, which requires residency for school attendance.

16. In late 2011, Kami entered into a relationship with another man, and in 2012 she moved to Arizona. She agreed that the children should stay in California with Bart, where they would continue their careers under Bart's management.

17. On January 11, 2013, Kami filed a petition for modification in the Superior Court of California, County of Los Angeles, family law division, Case No. BD576111. In her petition, she sought full custody of the children.

18. That case has been pending ever since, without resolution and with limited activity.

19. In California the parties entered into a preliminary agreement to parent the children, but there was no formal entry of the agreement in a court filing.

20. Kami did not dismiss the California modification case.

21. Since the agreement, Kami has moved her residency many times, living variously in Arizona, Missouri, California, and Utah.

22. The children have since flourished in their entertainment careers, appearing in 2016 on the hit NBC series America's Got Talent and making it to the semi-finals; performing on tour around the nation and internationally; and earning positive press in celebrity, entertainment, and pop news. The children pay California resident taxes on their entertainment talent income.

23. Before his elevation to the bench, Judge Eighmy had been the personal attorney of Bart's mother, Linda J. Luttenbacher (f/k/a Rockett), on several matters including her divorce from Bart's father.

24. At the time of his parents' divorce, Bart and his mother were estranged, and Bart sided with his father in that proceeding.

25. At the time of his parents' divorce, Bart was a prominent entertainer in Branson. Judge Eighmy, then Attorney Eighmy, would have routinely seen Bart on local billboards and in

other advertising for his entertainment work. Although Bart was obviously not a party to his parents' divorce, he would have had access to personal information about Bart and would have been seen in that case as adverse to his mother, then Attorney Eighmy's client.

26. Thereafter, Mrs. Luttenbacher and then Attorney Eighmy had a falling out over his alleged negligence in defending her in a traffic ticket case.

27. On July 25, 2018, while the Los Angeles modification petition she had filed in 2013 was still pending, Kami filed a new and separate modification petition in Taney County, Missouri, Case No. 07AF-CV00944-02.

28. Kami was represented by Michele L. Wilson, who had been her attorney in the original divorce case.

29. Bart was initially represented by an attorney friend named Sherri Harris, but as the litigation progressed, he discharged Harris and hired attorney Jessica Martin.

30. At the time of that filing neither Bart nor the children were living in Missouri. Kami was living in Missouri, but in August of 2019 she moved to Utah.

31. The Taney County case was assigned to Judge Eighmy.

32. Judge Eighmy did not recuse himself over the prior representation issues related to Mrs. Luttenbacher.

33. In August 2018, the Court appointed Kevin Easley as Guardian Ad Litem for the children.

34. Under the Uniform Child Custody Jurisdiction and Enforcement Act (a statute adopted by all 50 states except Massachusetts), Judge Eighmy lacked jurisdiction because neither the children nor their parents had a significant connection with Missouri, and substantial evidence was no longer available in Missouri concerning the child's care, protection, training, and personal relationships. RSMo. 452.700 *et seq.*

35. On August 26, 2019, Bart through counsel filed a motion to dismiss for lack of jurisdiction under the UCCJEA or, alternatively, as inconvenient forum. Bart's counsel noticed up that motion for hearing on September 5, 2019.

36. At the hearing, Judge Eighmy denied Bart's motion.

37. On September 19, Kami filed a motion styled "motion require [*sic*] Father to return children and to restrict Father's contact." Kami also filed a notice to shorten the time for hearing, proposing September 23 and September 26. At the time, the children were in Bart's custody and care.

38. Bart's counsel and the GAL both filed objections to the notice to shorten the time for hearing as to both dates, as Bart's counsel was already scheduled to be out of the country and the GAL was also unavailable, suggesting that October 3 was the better date.

39. Nevertheless, the Court held an *ex parte* hearing with Kami's counsel alone on September 26, and entered the following docket entry:

> Wilson appears. Mother does not have the children. Counsel for father is not in country. Court is concerned that children have not seen mother in 15 days. This case remains on the trial docket for Oct 8, 2019. This type of behavior does not bode well for a joint parenting arrangement. Judge Eighmy/sb

40. On October 2, Bart's counsel filed a new motion to vacate, again raising UCCJEA arguments as to why Judge Eighmy lacked jurisdiction, or alternatively that Taney County was an inconvenient forum. Bart's counsel also filed a motion to shorten the time for a hearing on that Motion to October 3.

41. On October 3 Judge Eighmy had a hearing before all counsel on then pending issues and entered the following docket entry:

> All counsel appear. Motion to vacate and dismissal taken up. Court requests contact information for the Judge in California. This case has been sitting dead since 2013 until very recent. GAL recommends 2 week on 2 week off schedule. Mother has not seen the children Since Sept 11, 2019. Father is now relying on a 2013 order. Court draws Mr. Rockets attention to 452.375.2.(2) and

> (4). Court orders all parties and children to be present on October 8, 2019 at 9:00am. Court will consider a writ of body attachment if the parties are not present. Court will attempt to set up a evidentiary hearing on jurisdiction but in all likelihood it will occur on Oct 8, 2019 at 9:00am before the trial. GAL Fees request taken up. Mother to bring GAL fees current and each side. Judge Eighmy/cb

42. On October 7, the day before the scheduled October 8 trial, Bart's counsel filed a letter with Judge Eighmy identifying the California case, indicating that it was before the Honorable Joshua Wayser, and providing to Judge Eighmy the contact information for Judge Wayser.

43. That same day, October 7, there was a hearing in the Los Angeles County case before Judge Wayser. At that hearing Bart appeared in person and Kami appeared by telephone. Neither parent had counsel.

44. During the hearing the children were present in the Los Angeles County courthouse, but remained in the hallway outside.

45. At that hearing nothing of substance occurred, although the judge indicated he would look into the jurisdiction issues further.

46. Afterward, Bart and the children raced from Los Angeles County to Forsyth, Missouri, the county seat of Taney County, first by flying from Los Angeles to Joplin via Dallas, and then driving to the home of Bart's mother and stepfather in Branson, arriving after midnight.

47. At 8:30 a.m. on October 8, Bart and the children appeared at the Taney County Courthouse.

48. The children had not seen Kami for approximately a month, and when they initially saw her in the courthouse lobby, they refused to speak to her.

49. The children understood that their mother had put obstacles in the way of their entertainment careers: for example, causing the cancellation of a South American tour, and refusing to let the kids leave her custody for auditions, even as the children wanted to

continue their careers.

50. Kami brought several family members with her to the courthouse.

51. Kami also brought as a witness an individual with whom the children had had prior contact and with whom they were uncomfortable.

52. The children eventually spoke with their mother in the courthouse lobby. They told her that they refused to visit with her and that they were "done with her" unless she would drop the case. They continued to encourage her to drop the case, but Kami refused to do so.

53. The GAL, Kevin Easley, encouraged the children to give their mother a hug, and talk with her.

54. KADAN stated that he was uncomfortable with that.

55. The GAL also stated to the children that he would try his best to have the children meet with the judge and to have their father have custody.

56. The GAL indicated to the children that the judge was in charge, and that they would have to do what he said.

57. As the day's proceedings began Bart's counsel, Kami's counsel and the GAL went into the courtroom for what according to the docket order should have been a hearing on jurisdiction.

58. The children sat in the courthouse lobby with Bart's mother and her husband (the children's paternal grandmother and paternal step-grandfather), at one end of a long hallway. Pursuant to courthouse rules, they did not have their cell phones. The phones were in his mother's car in which Bart and the children had driven to the court house.

59. Kami sat with her family and supporter at the other end of the hallway.

60. A court-ordered child counselor, Dr. Cindy Baker, was also present in the courthouse lobby.

61. Judge Eighmy did not take up the jurisdictional issue.

62. In the courtroom Judge Eighmy stated words to the effect of: "go work this out, or the kids will be out of the entertainment industry."

63. Judge Eighmy also made other statements to the attorneys that led Bart's attorney to believe that if the case went to trial that day then Bart would lose custody. For example, Judge Eighmy asked if Bart would be willing to move to Utah "to be able to see his children," which led Bart's counsel to have a concern that Judge Eighmy would give Kami custody of the children.

64. The parties then left the courtroom to engage in settlement negotiations.

65. Bart's counsel stated to Bart that he would likely lose the custody case if it went to trial, and that he should settle to prevent the children being thrown out of the entertainment industry.

66. The GAL also urged Bart to settle to prevent the children being thrown out of entertainment industry.

67. Over the course of a full day, the parties negotiated a settlement by interlineating a typed document entitled "Mother's Proposed Parenting Plan" as well as making handwritten notes.

68. During the course of the back-and-forth of settlement negotiations, Bart's counsel informed him that the children would go home that day with Kami, to dine with maternal cousins and then to spend the night with Kami at her hotel accommodations.

69. Bart agreed to this arrangement in connection with settlement, but suspected that the children would resist going with their mother. This arrangement as to the children going with Kami that day was not memorialized in the "Mother's Proposed Parenting Plan" or the handwritten notes.

70. Around 4:00 p.m. the parties and their attorneys, but not the children, entered the courtroom.

71. The attorneys told Judge Eighmy the terms of the settlement, and he took testimony from the parties in which they accepted the terms as written on the parenting plan and notes. According to the accompanying docket entry there is a sound recording of this proceeding.

72. The GAL stated on the record that he believed the settlement was in the children's best interest.

73. The settlement gave legal and physical custody to Kami, but allowed the children to be in California with Bart from the 1st to the 10th of each month; from the 1st to the 15th during the summer; and at all times during TV pilot season (roughly January through April); and to otherwise continue full management of their entertainment careers pursuant to a "California standard production / management agreement." The children could be with Bart for auditions, meetings, and while they were working, which would override the otherwise pre-determined parenting schedule.

74. On information there is no such document denominated a "California standard production / management agreement." Bart presumed that the children's entertainment management would be worked out later through a fair agreement.

75. During the negotiation, Bart felt duress and pressure to enter into some sort of settlement to protect the children's professional careers.

76. Judge Eighmy signed the attorneys' handwritten notes. He did not denominate those notes as a Judgment. [4]

[4] *Prof'l Funding Co. v. Bufogle,* 617 S.W.3d 509, 513 (Mo. App. 2021) (defining Judgments).

77. Immediately after the hearing, that same day, Judge Eighmy made the following docket entry:

> All parties appear with counsel. GAL appears. Dr. Baker appears. Case called.
>
> Court has jurisdiction over the custody issues regarding the children. Court had a UCCJEA meeting with the California Judge and both Judge's [*sic*] were in agreement that Missouri has jurisdiction. Parties announce a settlement that has been read by counsel and the parents and signed. Parties under oath acknowledge that this agreement is in the best interests of the children. Wilson to prepare the judgment. Dr. Baker to visit with the children. Judge Eighmy/cb.

78. Judge Eighmy thus asserted on the record that he had had a meeting with the California judge, presumably by telephone, in which the judges agreed that Missouri had jurisdiction over the case.

79. After the court hearing, Bart met with Dr. Baker, the court-ordered child counselor, in the courthouse lobby. Dr. Baker encouraged Bart to remain positive. Bart told Dr. Baker that he anticipated that the children would not "go for" the settlement agreement. The children then joined Bart and Dr. Baker, and told Dr. Baker that they did not agree with the settlement and would not go with their mother.

80. Immediately afterward, the children then met and spoke with their mother. As Bart anticipated, the children told her they did not want to go with her at the end of that day, and did not want her to have part-time custody.

81. The children then met with Dr. Baker in a conference room adjacent to the courthouse lobby. The children told Dr. Baker that they did not want to live even part-time with their mother.

82. Bart left the courthouse. He stood for a while with his stepfather on a public sidewalk next to his mother's car, talking about the settlement.

83. Bart then retrieved the children's cell phones from his mother's car. Court officers started shouting "leave or be arrested." Bart was startled and confused, as it became apparent that the officer was directing his statements to Bart. Bart explained that he intended to return the children's cell phones to them. The officers refused to provide a badge number or ID, or let Bart take a photo or recording of them.

84. Bart complied with the officers' order to leave, got into his mother's car, and left without delivering the cell phones back to the children.

85. At this point, Bart was uncertain what was going on with the children and their mother.

86. Bart then drove to his mother's house.

**Jailing in Taney County Courthouse Holding Cells**

87. Back in the courthouse, a conversation ensued between the children, Dr. Baker and Judge Eighmy.

88. Judge Eighmy was no longer in his judge's robes.

89. That conversation started in the public lobby area of the courthouse, but then Judge Eighmy moved the meeting to a private conference room.

90. The children explained to Judge Eighmy why they did not want to go with their mother and why "it was wrong."

91. Judge Eighmy stated that he had ordered that and stated they had to go with their mother.

92. The children responded to several statements from Judge Eighmy that they "respectfully disagreed."

93. In Dr. Baker's presence, Judge Eighmy then proceeded to lecture the children on the evils of Hollywood, and the need to grow up "normal," that is, without working as talent in

the entertainment industry. Judge Eighmy also told the children they needed to listen to and live with their mother in Utah.

94. Kadan then spoke up and told Judge Eighmy that he and his sister B.R. already lived in California and were already working in the entertainment industry. Kadan asked Judge Eighmy how his professional entertainment work was different in kind than being in high school band or being a cheerleader.

95. At this point, Judge Eighmy became visibly agitated, stated words to the effect of "I will show you what I can do; I can put you in jail," and told the children to follow him.

96. Kadan said words to the effect of: "I don't know how you have a right to lock us up. We have done nothing wrong."

97. Judge Eighmy then, by himself and without Dr. Baker, took the children down some stairs, where they arrived in a room where two women were sitting at their desks. The women appeared to be clerks or civilian personnel, and were not wearing uniforms.

98. Judge Eighmy stated to the two women words to the effect of "keep your eye on these two. Make sure they don't run off." Judge Eighmy then left the room.

99. Judge Eighmy returned a few minutes later. He told the children to follow him.

100. They went down various hallways to a different room where there were doors to jail cells.

101. The jail cells appeared to be intended for use of adult detainees or convicts, not children who were neither charged with a crime, being held in contempt, or found delinquent.

102. Two uniformed officers were by the jail cells, one male and one female. The female officer was named Darlene Rea.

103. The children again stated to Judge Eighmy that they did not want to go with their mother, and that Judge Eighmy could not prevent them from working in the entertainment industry.

104. Judge Eighmy again stated that he could lock them up.

105. Judge Eighmy's face was red and he was breathing heavily. He angrily ordered the children to take off their shoes and socks, and their jackets.

106. Kadan was wearing a bracelet which Kadan had obtained at a church camp, and had made a religious commitment not to remove. Judge Eighmy, after learning of this, ordered Kadan to remove the bracelet anyway.

107. Judge Eighmy and the uniformed officers then led the children to jail cells. Judge Eighmy ordered the uniformed officers to lock Kadan in one cell, and B.R. in another.

108. The male officer locked the children in the cells.

108. Each cell had a small window in the door, and the children could not see or hear each other.

109. The cells were cold and smelly.

110. The children's bare feet were cold.

111. B.R. stood on a raised bed mat because her feet were cold.

112. While B.R. was standing on the raised bed mat, the male officer banged on the jail cell window and told her to get down. Kadan heard this event.

113. On inference, at least one of the two uniformed officers was thus watching the children by video camera.

114. Both children assumed one or both officers were watching their jail cells.

115. There were open toilets in each jail cell, but the children were afraid to use them because of the concern that they were being watched.

116. After a significant passage of time, the exact amount unknown but approximately an hour, more or less, Judge Eighmy and the uniformed officers returned and removed the children from their respective cells.

117. Judge Eighmy said words to the children to the effect of: “Are you ready to listen to me? Ready to comply?”

118. The officers were present. Judge Eighmy said words to the effect of: “Will you go with your mother or do you want to go back in there.”

119. B.R. replied to Judge Eighmy with words to the effect of: “Respectfully, how can you just lock up kids? This isn’t legal, we’ve done nothing wrong.” Kadan added words to a similar effect.

120. Judge Eighmy then stated words to the effect of: “How would you like me to take you away from your parents and send you to live in the Missouri foster care system?”

121. The children, fearing further jail time and/or foster care, stated they would comply with Judge Eighmy’s directive to live with their mother in Utah.

122. The children put on their shoes and socks.

123. Judge Eighmy and Darlene Rea then escorted the children back to the courthouse lobby. At that point, the children’s mother was still in the lobby, but Dr. Baker had departed.

124. Darlene Rea then stated to Kami, in a loud voice so that the children could hear, words to the effect of: “If you have any more problems with the kids, call me.” The children interpreted this as a threat to be locked up again by Judge Eighmy.

125. Judge Eighmy then stated to the children: “You are going to live with your mother in Utah.”

126. B.R. then shook her head. Judge Eighmy yelled at B.R. words to the effect of: “What did you say? Did you say something? You sure you didn’t say something?”

127. B.R. told Judge Eighmy words to the effect of: "I didn't say anything."

128. At this point, under duress, and in order to avoid further jailing, the children stated to Judge Eighmy that they would go and live with their mother in Utah.

129. Ms. Rea gave her business card to the children's mother.

130. The children then went with Kami to their aunt's house.

131. At some point in the 5:00 p.m. hour, Kami had texted Bart that Judge Eighmy had locked up their children in the courthouse jail cells.

132. Within approximately 36 hours the children left with their mother to go to Utah.

133. At no point had either child entered the courtroom or attended any part of any judicial proceeding.

134. At no point was either child accused of, or found to be, delinquent or in contempt of court.

135. At no point before the jailing did Judge Eighmy notify the GAL or Bart that he was going to jail the children, or provide any party or attorney involved an opportunity to be heard.

136. At no point did Judge Eighmy ever make a record or findings, or enter orders, related to his jailing of the children.

137. At no point did the children have any process of law (let alone due process) related to their jailing.

**<u>The UCCJEA Jurisdictional Determination</u>**

138. In the days after their jailing, the children returned to Bart's custody and care.

139. On October 28, approximately three weeks later, Kami, by counsel, filed a post-hearing "motion to reconsider and re-open the case for presentation of evidence", and to require Bart to return the children to Kami and to restrict Bart's contact.

140. On October 30, Bart's attorney filed a motion for change of judge for cause.

141. On October 31, Judge Eighmy held a hearing with counsel. Counsel for Bart and Kami each asked Judge Eighmy not to approve the settlement, stated that there were problems with it, and observed that the children were not willing to be compliant with its terms.

142. Judge Eighmy observed orally that neither party now lived in Missouri. Nevertheless, Judge Eighmy approved the settlement and signed the Judgment of Modification, including as exhibits the parenting plan and the handwritten notes.

143. Judge Eighmy made the following docket entry:

> All counsel appear. Motion for change of judge denied. Mother's post trial motions denied. Judgment signed. Court has heard that the parties are already having trouble. No party now resides in Missouri. Court encourages mother to register the judgment in Utah and request relief from that State's court under the emergency provisions of the UCCJEA. Judge Eighmy/cb

144. RSMo. 452.765.2 describes the procedure to be followed when two courts have pending proceedings regarding custody and visitation:

> Except as otherwise provided in section 452.755, a court of this state, prior to hearing a child custody proceeding, shall examine the court documents and other information supplied by the parties under section 452.780. If the court determines that a child custody proceeding was previously commenced in a court in another state having jurisdiction substantially in accordance with sections 452.700 to 452.930, the court of this state shall stay its proceeding and communicate with the court of the other state. If the court of the state having jurisdiction substantially in accordance with sections 452.700 to 452.930 does not determine that the court of this state is a more appropriate forum, the court of this state shall dismiss the proceeding.

145. RSMo. 452.730 describes the procedure for communication between courts:

> Communication between courts. — 1. A court of this state may communicate with a court in another state concerning a proceeding arising under sections 452.700 to 452.930.
>
> 2. The court may allow the parties to participate in the communication. If the parties are not able to participate in the communication, the parties shall be given the opportunity to present facts and legal arguments before a decision on jurisdiction is made.

> 3. A communication between courts on schedules, calendars, court records, and similar matters may occur without informing the parties. A record need not be made of such communication.
>
> 4. Except as provided in subsection 3 of this section, a record shall be made of the communication. The parties shall be informed promptly of the communication and granted access to the record.
>
> 5. For the purposes of this section, "record" means information that is inscribed on a tangible medium, or that which is stored in an electronic or other medium and is retrievable in perceivable form. A record includes notes or transcripts of a court reporter who listened to a conference call between the courts, an electronic recording of a telephone call, a memorandum or an electronic record of the communication between the courts, or a memorandum or an electronic record made by a court after the communication.

146. There was no evidentiary hearing or due process of law on the UCCJEA jurisdictional issues raised by Bart.

147. There is no recognized UCCJEA jurisdictional determination procedure whereby judges from different state courts simply talk on the phone and privately and without involvement of the parties make a decision on the merits as to which court has jurisdiction, without more process and a finding of jurisdiction by the court of first jurisdiction.[5]

148. Although Judge Eighmy made a determination that he had jurisdiction, he did not follow the statute for his communication with the California court in that, in the alternative, Bart and Kami were neither parties to the communication, nor were given the opportunity to present facts and make legal arguments before a decision on jurisdiction was made. Nor was a record made of the communication, as that term is defined by the statute, even though it did not fall into the exception for schedules, calendars, court records, and similar matters.

149. The California court's electronic docket record shows neither no finding or a record declining jurisdiction, nor a record of the call.

---

[5] *Blanchette v. Blanchette,* 476 S.W.3d 273, 280 (Mo. 2015).

150. Furthermore, a court's jurisdiction is a matter of law that cannot be established by agreement, consent or waiver of the parties.[6]

151. On Wednesday, October 30, 2019 it was Bart's turn for custody. Bart came to Utah and picked up the children.

152. The children refused to return to their mother's custody thereafter.

153. Afterward, Bart filed a police complaint with local law enforcement in Forsyth, Missouri as to Judge Eighmy's action locking up the children. He also filed a judicial complaint.

154. On information and belief, based on the Forsyth police report, Bart's complaint went nowhere after Judge Eighmy told an investigating officer that he could not comment on his actions as a judge.

**Jailing in Union Parish, Louisiana**

154. In the spring of 2020, Bart and the children traveled from Los Angeles to live in Union Parish, Louisiana, at Bart's father's family farm.

155. The purpose of the move was to quarantine from the COVID-19 virus.

156. After the spring of 2020 Bart and the children stayed at the Union Parish farm generally constantly. The kids did perform three weeks of shows at the Theatre of the Stars in Pigeon Forge, Tennessee.

157. On May 11, 2020 Kami filed in Taney County a motion for civil contempt and a proposed order to show cause against Bart, alleging Bart was withholding custody of the children.

158. Judge Eighmy signed the show cause order on June 18, 2020.

[6] *Id.*

159. Early that summer the children were preparing to act in a theatrical production, pursuant to contract, in Pigeon Forge, Tennessee, where they were to perform at the Theater of the Stars, co-headlining with the winner of the NBC television show "The Voice."

160. Bart and the children traveled to Pigeon Forge.

161. At Pigeon Forge, Bart was served the show cause order by a special process server.

162. Bart retained new counsel in Missouri, Theodore "Ted" Von Willer, Jr., who entered his appearance for Bart in the Missouri case on July 29.

163. At some point Kami started calling the producers of the Pigeon Forge show, telling them that Bart did not have the right to book the children there. This caused confusion and issues with the children's contractual obligations.

164. On July 31, 2020, Judge Eighmy issued an order to Bart and the children to appear in his courtroom on August 13, 2020 at 11:00 a.m.

165. On August 5, Bart's new counsel filed a motion to disqualify Judge Eighmy for cause.

166. On August 10, Bart's new counsel filed:

a. A motion to dismiss the civil contempt motion, and to strike the Order to show cause, and

b. A motion to continue the hearing so that Bart through counsel could conduct discovery on the civil contempt motion.

167. Bart and the children did not appear at the August 13 hearing, but Bart's new counsel did, and argued the motions.

168. On that day Judge Eighmy denied each motion from the bench.

169. The next day, August 14, Judge Eighmy issued two orders:

a. An Order to Pick Up the children (Ex. 1), and

b. A Writ of Bodily Attachment for Bart (Ex. 2).

170. On September 10, 2020 Bart's attorney filed a petition for writs of prohibition against Judge Eighmy in the Missouri Court of Appeals for the Southern District, SD36820, seeking to (a) prohibit Judge Eighmy from proceeding further on the underlying contempt motion, (b) prohibit him from enforcing the Writ of Body attachment against Bart and compel him to set it aside, (c) prohibit him from enforcing the Pick Up Order For Minor Children and compel him to set it aside, and (d) compel Judge Eighmy to disqualify himself from sitting on and hearing and determining the underlying contempt motion.

171. The Missouri Court of Appeals denied that petition within 24 hours.

172. On September 15, Bart filed a similar writ petition with the Missouri Supreme Court, SC98716, on the same grounds.

173. The next day the Supreme Court ordered briefing.

174. Kami's attorney, Michele L. Wilson, filed suggestions of law for Judge Eighmy as Respondent in the Supreme Court writ practice.

175. Union Parish sheriff's deputies showed up at the family farm on November 18, 2020 and said they were there to take the children to their mother at the Sheriff's Department.

176. The deputies stated they were enforcing Judge Eighmy's Pick-Up Order against the children.

177. The children had been previously aware of Judge Eighmy's Pick-Up Order.

178. At that time, Bart and the children were 35 miles away in Farmerville, Louisiana.

179. Bart's father called him, and Bart spoke with him and a deputy, and Bart stated to the deputy that he would return with the children.

180. Bart did so, and upon his return to his mother's house, the deputies had already left. Bart started to pack up the children's possessions.

181. Approximately an hour later a different set of deputies, presumably after a shift change, came to the Union Parish home. The children told those deputies they would not leave Bart and would not go to Kami.

182. The deputies argued with the children, telling them they had to leave the home with them.

183. After approximately 30 minutes, a deputy read the children their Miranda rights, and then handcuffed Kadan behind his back.

184. Kadan did not resist arrest.

185. B.R. was also handcuffed and was also compliant.

186. The handcuffs caused physical injuries to the children's wrists, particularly pain. The children received no medical treatment for those injuries.

187. The handcuffing was recorded on smartphone video by the children as well as some friendly neighbors, and the footage instantly went viral on national entertainment news sites.[7]

188. The children asserted to the deputies that the arrest was improper and wrong, but the deputies proceeded to make the arrests.

---

[7] *See, e.g.,* Dana Kennedy, *'AGT' kid magicians The Rocketts strip searched before jail time, neighbor says,* N.Y. Post (Nov. 28, 2020), available online at https://nypost.com/2020/11/28/atgkid-magicians-the-rocketts-strip-searched-before-jail-neighbor/; *'AGT' Kid Magicians [Redacted] & [Redacted] Arrested for Refusing to Live with Mother,* TMZ (Nov. 27, 2020), available online at https://www.tmz.com/2020/11/27/agt-kid-magicians-Kadan-brooklyn-rockettarrested-custody-battle-refused-return-mother/


22

189. After the arrest and the reading of the Miranda rights (including the right to counsel), B.R. asked for a lawyer.

190. The deputies responded that she was a child and that her parents would have to hire a lawyer, and that the children had not been arrested and so had no right to an attorney.

191. The deputies did not enforce Judge Eighmy's Writ of Body Attachment Order against Bart.

192. The deputies moved Kadan's handcuffs to his front.

193. The deputies then placed the children, separately, in the caged back seat of respective police SUVs. The children were terrified because they could not communicate with each other. Deputies then drove the children to the Union Parish Sheriff's Department, where Kami was waiting in her van. By then it was late in the evening, long after dark, and the children were tired and had not eaten since breakfast.

194. Kami exited her van, and the children argued with her, in a stand-off.

195. Kadan kept stating that to Kami he would not go with her.

196. Kami went around to unhook B.R.'s seat belt from the back caged area of the police car, and they argued. B.R. stayed in the car.

197. The deputies told the children to go with their mother.

198. The deputies, the children and Kami all went inside the station. Their ensued further argument with the persons involved maintaining their positions in the argument.

199. At one point, Kami wrestled the children's phones away from them and then grabbed B.R. and tried to drag her out of the room.

200. Starting at approximately 4:00 a.m., the deputies drove the children to the Green Oaks juvenile detention center, an hour's drive away from the Union Parish Sheriff's Department, in neighboring Ouachita Parish.

201. On arrival at Green Oaks each child was strip searched and put in a cell. The children went to sleep, still without food, but after approximately an hour the children were then reawakened and subjected to a mental evaluation.

202. Each child was held in solitary confinement cell for two days, with no visitors allowed, although Bart tried to visit. There were cockroaches in the children's cells.

203. Meanwhile, on November 19, 2020, during the children's first full day of confinement, the Missouri Supreme Court entered a peremptory writ of prohibition in the interests of justice against Judge Eighmy (Ex. 3), ordering him to vacate all orders entered after the filing date of the motion to disqualify him for cause, August 5, 2020, which was before Judge Eighmy issued the Pick-up Order. The Supreme Court further appointed a senior judge, The Honorable Richard G. Callahan, to preside over the motion to disqualify Judge Eighmy for cause. The Court further ordered that "all other pending matters may be addressed once the motion to disqualify Respondent has been resolved."

204. Judge Callahan ordered a hearing on the motion to disqualify Judge Eighmy on February 5, 2021. Two days before the hearing Judge Callahan vacated the hearing setting, for reasons unspecified in the Case Net docket entries.

205. Since that time there has been no further activity in the Missouri family law case.

206. Judge Callahan recently resigned his position as Senior Judge to serve as a special prosecutor on a wholly unrelated criminal case.

207. Bart had hired a local attorney, Dhu Thompson, in mid-August of 2020 to represent him. That attorney took no initial action.

208. Upon the release of the Missouri Supreme Court ruling, Bart's counsel, Mr. Thompson, delivered a copy to the Louisiana Judge

209. The children were also charged criminally with being "ungovernable." Nevertheless, those charges were promptly dropped.

210. After two days, the children had a hearing before the Louisiana Judge.

211. The Louisiana Judge immediately ordered the children released into Bart's custody.

212. The local judge further ordered the children to remain in Union Parish until further process related to custody issues.

213. Bart and the children have complied with that order.

214. Bart has since filed a Petition to Modify Custody in Union Parish, Louisiana.

215. In that pleading Bart assert that Union Parish is his and the children's residence. Local counsel has advised Bart that this would be cheaper and quicker, and safer under COVID-19, than litigating the modification issue in California.

216. The Union Parish court entered an Order on April 29, 2021 formally determining it had UCCJEA jurisdiction over the parties' custody case based on residency. Ex. 4.

217. Kami dismissed her Missouri case on May 3, 3021, and Judge Eighmy entered an Order of dismissal on May 4, 2021. Ex. 5.

218. Thereafter it has been undisputed by Bart and Kami, and the respective courts, that Missouri does not have jurisdiction, and that Louisiana does.

219. As of this filing, the family law case is pending in Union Parish, Louisiana. Bart maintains custody and Kami does not have visitation.

**<u>Causation of Damages</u>**

220. On information and belief, the Taney County holding cells in which Plaintiff's minor children were held are intended only to hold adults arrested upon probable cause of a criminal offense.

221. On information and belief, the solitary confinement cells at Green Oaks juvenile detention center in Ouachita Parish, Louisiana are designed for "delinquent" children who are detained for being unable "to adequately handle [their] problems" and live within the "laws of society."[8]

222. Being held in the Taney County and the Green Oaks cells was terrifying to the children who had not committed a crime, nor engaged in contempt or delinquency, but merely made an out-of-court statement that they did not want to live with their mother.

223. In the context of divorce and child custody, it is common for teenagers not to want to visit or live with a parent.[9]

224. There is no legitimate or normal judicial function to the act of seizing minor children and holding them in adult jail cells to "teach them a lesson" to go along with a proposed civil child custody arrangement, under any circumstances, but particularly absent criminal activity, juvenile delinquency or status offense[10], or a judgment or order of contempt of court against the minor children.

225. On October 8, Judge Eighmy had not yet even entered a Judgment as to custody.

226. The children were not before the court as party litigants, and thus could not be in civil contempt.[11]

---

[8] *See* Green Oaks Juvenile Detention website, available online at https://www.oppj.org/departments/green_oaks/to_the_child.php

[9] Missouri courts recognize the difficulty that a parent has trying to force teenage and even preteen children to do things that they do not want to do. *D.R.P. v. M.P.P.,* 484 S.W.3d 822, 829 (Mo. App. 2016), citing *Shanks v. Shanks,* 603 S.W.2d 46, 48 (Mo. App. 1980). So too do the courts of California, *see, e.g., Coursey v. Superior Ct.,* 194 Cal. App. 3d 147, 154–56, 239 Cal. Rptr. 365, 369–70 (1987).

[10] *See* RSMo. 211.031.

[11] *Sophian Plaza Ass'n v. City of Kansas City*, 584 S.W.3d 784, 788 (Mo. 2019).

227. Bart and his counsel were not notified, and did not have opportunity to be heard, as to the jailing of the children.

228. The GAL was not notified of, and did not have opportunity to be heard, as to the Taney County jailing, and therefore the children lacked advocacy as to their interests.

229. The GAL was also not notified of the Show Cause Order or the Pick Up Order, and therefore the children lacked advocacy as to the interests.

230. Judge Eighmy's Pick Up Order resulting in the Green Oaks jailing was made in complete absence of jurisdiction.

**No Probable Cause or Arguable Probable Cause for Seizure in Taney County jail**

231. There was no probable cause or arguable probable cause[12] for Judge Eighmy to seize the children for a crime; for delinquency; for contempt of court; or pursuant to any lawful process.

**No Sovereign Immunity**

232. Since Plaintiffs asserts their claims against defendant Judge Eighmy only in his individual capacity, he has no sovereign immunity.[12]

**No Judicial Immunity for Judge Eighmy as to Taney County jailing**

233. Judicial immunity applies when two requirements are met: jurisdiction over the dispute, and a judicial act. As to the first requirement, a judge lacks immunity when he has acted in the clear absence of all jurisdiction, and not merely in excess of his jurisdiction.

234. Judge Eighmy's acts in seizing the minor children were not done pursuant to any pleading or motion before him; were not done pursuant to any contempt before him (particularly since the minor children never even entered his courtroom or chambers while court was in

[12] *Borgman v. Kedley,* 646 F.3d 518, 522-23 (8th Cir. 2011).
[12] *Hafer v. Melo,* 502 U.S. 21 (1991).

session or at any other time); were not pursuant to any process of law (let alone due process of law); were not done on the record, pursuant to any finding of fact, conclusion of law, order or judgment of the court, or any record whatsoever; do not appear in any court filing or record; and did not occur with the consent of the parties to the modification case or their counsel.

235. Thus Judge Eighmy's personal seizure of the minor children and jailing them were acts that:

a. Are not normal judicial functions[13] (an individual seizure of a person is a police power act);

b. Did not occur in the judge's courtroom or chambers (they occurred after hours in the lobby and downstairs in the cells);

c. Did not center around a controversy then pending before the judge (there was no allegation that the children were in contempt of court or delinquent); and

d. Did not directly and immediately arise out of a visit by the minor children to the judge in his judicial capacity (there was no judicial capacity to the after-hours meeting in a conference room or the jailing in the cells).

236. Personally seizing and jailing minor children, outside of the courtroom while court is not in session, is not a judicial act. There was no judicial function or purpose to Judge Eighmy's actions in seizing the children. Rather Judge Eighmy dragooned the children into the jail cells without even a star chamber proceeding.[14]

237. In the alternative, Judge Eighmy was acting as a police officer in seizing the children, for which he lacks judicial immunity.[14]

---

[13] *Brewer v. Blackwell,* 692 F.2d 387, 396-97 (5th Cir. 1982).
[14] *Zarcone v. Perry,* 572 F.2d 52, 55 (2d Cir. 1978).
[14] *Kovacic v. Cuyahoga Cnty. Dep't of Children & Family Servs.,* 724 F.3d 687, 694 (6th Cir. 2013).

238. In the alternative, Judge Eighmy was acting as a prosecutor in seizing the children, for which he lacks judicial immunity.[15]

239. In the alternative, Judge Eighmy's conduct is clearly not contemplated by the judicial role.[16]

240. Judge Eighmy acted in the clear absence of jurisdiction in personally seizing the children and personally jailing them.

**<u>Rooker-Feldman doctrine inapplicable</u>**

242. Plaintiff is not asking this Court to enjoin any state court custody proceeding, or to reverse any state court order or judgment. Thus the Rooker-Feldman doctrine does not bar Plaintiff's constitutional claims in this suit.[17]

**<u>Damages</u>**

243. The children have nightmares, suffer garden-variety emotional distress, and are upset all as a direct result of their jailing.

244. The children distrust the legal system, including judges and law enforcement, all as a direct result of their jailing.

**<u>Punitive Damages</u>**

246. The conduct of Judge Eighmy toward the children in personally seizing them was malicious and/or reckless to their Fourth Amendment rights to be free of unlawful seizure, and their First Amendment rights to speak up about their living and working preferences outside of the courtroom while court is not in session.

---

[15] *Lopez v. Vanderwater,* 620 F.2d 1229 (7th Cir. 1980).

[16] *Ammons v. Baldwn,* 705 F.2d 1445 (5th Cir. 1983); *see also Dean v. Byerley,* 354 F.3d 540, 556 (6th Cir. 2004).

[17] *See, e.g., Hendrixson v. Harris,* No. 4:20-cv-621-SNLJ (E.D. Mo. Aug. 18, 2020).


29

## Attorney's Fees and Costs

247. In pursuit of their § 1983 civil rights claims on behalf of the children, Plaintiffs are incurring reasonable attorney's fees, taxable costs, and non-taxable costs, each compensable under 42 U.S.C. § 1988.

## Count I – Unreasonable Seizure, Taney County Jailing

248. Plaintiffs incorporate all prior paragraphs.

249. Defendant Judge Eighmy personally seized Kadan and B.R. (both then children) for approximately an hour in the Taney County Courthouse jail cells, and

250. The seizure was unreasonable and not necessary for any lawful purpose; and

251. As a direct result, the children were injured.[18]

### Punitive Damages

252. Judge Eighmy's acts in personally seizing and jailing the children were malicious or recklessly indifferent to the Fourth Amendment rights of the children to be free from unreasonable seizures of their person.

### Prayer

WHEREFORE Plaintiff D. Bart Rockett as next friend of his minor child B.R. and Plaintiff Kadan Rockett pray the Court enter a judgment for Fourth Amendment unreasonable seizure against Defendant the Honorable Eric D. Eighmy in his individual capacity; award Plaintiffs actual and punitive damages; award Plaintiffs their taxable costs, non-taxable costs, and

---

[18] Manual of Model Civil Jury Instructions for the District Courts of the Eighth Circuit (2020), Instruction No. 4.04


30

reasonable statutory attorney’s fees under 42 U.S.C. § 1988; and grant such other relief as may be just, meet and reasonable.

**<u>Count II –Retaliation for Exercise of First Amendment Rights</u>**

253. Plaintiffs incorporate all prior paragraphs.

254. Defendant Judge Eighmy seized the children for approximately an hour in the Taney County Courthouse jail cells, and

255. The children engaged in a protected First Amendment activity in stating to Judge Eighmy in the courthouse lobby, after court was no longer in session, that they wished to remain living with their father in Los Angeles County and remain working as Hollywood entertainers, and that “they had done nothing wrong,” and[19]

256. Defendant Judge Eighmy's adverse actions against the children would chill a person of ordinary firmness from continuing in their speech, and

257. Defendant Judge Eighmy’s acts were motivated at least in part by the children’s exercise of a First Amendment protected activity.

258. As a direct result, the children were damaged.[20]

**Punitive Damages**

259. Judge Eighmy’s acts in personally seizing and jailing the children were malicious or recklessly indifferent to their First Amendment rights to speak up outside of their courtroom, after court was no longer in session, about their preferences as to where they wished to live and work.

---

[19] Eighth Circuit Model Civil Jury Instructions Section 13.04.

[20] *See, e.g., Bennie v. Munn,* 58 F. Supp. 3d 936, 937 (D. Neb. 2014), *aff’d,* 822 F.3d 392 (8th Cir. 2016), *cert. denied,* 137 S. Ct. 814 (2017); *see also Malik v. Arapahoe County,* 191 F.3d 1306, 1315-16 (10th Cir. 1999) (denying qualified immunity and finding that seizure of child was First Amendment retaliation against mother for retaining an attorney).

**Prayer**

WHEREFORE Plaintiff D. Bart Rockett as next friend of his minor child B.R. and Plaintiff Kadan Rockett pray the Court enter a judgment for First Amendment Retaliation against Defendant the Honorable Eric D. Eighmy in his individual capacity; award Plaintiff actual and punitive damages; award Plaintiff their taxable costs, non-taxable costs, and reasonable statutory attorney's fees under 42 U.S.C. § 1988; and grant such other relief as may be just, meet and reasonable.

**<u>Count III – Due Process Violation</u>**

265. Plaintiffs incorporate all prior paragraphs.

266. The liberty protected by the Due Process Clause of the Fourteenth Amendment includes the concept of personal bodily integrity and the right to be free of unauthorized and unlawful physical abuse by state intrusion.

267. Judge Eighmy caused an occurrence of physical or bodily abuse of the children that involved physical force, mental coercion, or emotional damage[21] in Taney County by his personal seizure of the children.

268. The physical or bodily abuse was so demeaning and harmful under all the circumstances as to shock one's conscience.

269. As a direct result, the children were damaged.

[21] *United States v. Lanier*, 520 U.S. 259, 262 (1997). Note that this elides the element of "bodily injury," but the Supreme Court lists four types of physical or bodily abuse in the alternative, using the conjunctive "or."

**Punitive Damages**

270. Defendant Judge Eighmy's acts in personally seizing the children in Taney County was malicious or recklessly indifferent to the Fourteenth Amendment rights of the children to be free of unauthorized and unlawful physical abuse by state intrusion.

**Prayer**

WHEREFORE Plaintiff D. Bart Rockett as next friend of his minor child B.R. and Plaintiff Kadan Rockett pray the Court enter a judgment for Fourteenth Amendment conscience-shocking due process violation against Defendant the Honorable Eric D. Eighmy in his individual capacity; award Plaintiffs actual and punitive damages; award Plaintiffs their taxable costs, non-taxable costs, and reasonable statutory attorney's fees under 42 U.S.C. § 1988; and grant such other relief as may be just, meet and reasonable.

Respectfully submitted,

Co-Counsel for Plaintiff

/s/ Hugh A. Eastwood .
Hugh A. Eastwood, 62058MO
7911 Forsyth Blvd., Ste. 300 St.
Louis, Missouri 63105-3825
hugh@eastwoodlawstl.com
(314) 809 2343
(314) 228 0107 eFax

/s/ W. Bevis Schock .
W. Bevis Schock, 32551MO
7777 Bonhomme Ave., Ste. 1300
St. Louis, MO 63105
wbschock@schocklaw.com
Fax: 314-721-1698
Voice: 314-726-2322

## **Certificate of Service**

The undersigned certifies that on October 13, 2023 that (s)he filed a copy of this document with the District Clerk to be served by operation of the Court's CM/ECF service upon all counsel of record.

*/s/ Hugh A. Eastwood, 62058MO*